1

2

3

4                          UNITED STATES DISTRICT COURT

5                        NORTHERN DISTRICT OF CALIFORNIA

6

7   MICHELLE Z., et al.,                    Case No. 23-cv-05784-AMO

8                  Plaintiffs,              **ORDER RE CROSS-MOTIONS**

9           v.                              Re: Dkt. Nos. 48, 52

10  CALIFORNIA PHYSICIANS' SERVICE,

11                 Defendant.

12

13

14          Plaintiffs Michelle Z. and Bo. Z commenced this action against Defendant California

15  Physician's Service, doing business as Blue Shield of California, challenging the denial of

16  coverage for mental health treatment services for their child, A.Z.,[1] under two different medical

17  insurance policies.  Before the Court are the parties' cross-motions for judgment on Plaintiffs'

18  claim for recovery of benefits due under the Employee Retirement Income Security Act

19  ("ERISA"), 29 U.S.C. § 1132(a)(1)(B), and their cross-motions for summary judgment on

20  Plaintiffs' state law claims for breach of contract and breach of the covenant of good faith and fair

21  dealing.  The Court held a hearing on the parties' pending cross-motions on October 9, 2025.

22  Having considered the parties' papers, the relevant legal authority, and the arguments advanced by

23  counsel during the hearing, the Court now resolves those motions as set forth below.[2]

24  _____

25  [1] For privacy reasons, the Court does not use A.Z.'s name in this order.  Additionally, the Court
    refers to A.Z. using they/them pronouns consistent with the record.

26

27  [2] With respect to the ERISA claim, this order sets forth the Court's findings of fact and
    conclusions of law pursuant to Federal Rule of Civil Procedure 52(a)(1), which provides that "[i]n
    an action tried on the facts without a jury or with an advisory jury, the court must find the facts
28  specially and state its conclusions of law separately."  Fed. R. Civ. P. 52(a)(1).  "To the extent that

United States District Court
Northern District of California

I.    **BACKGROUND**

A.    **The Blue Shield Individual and Family Plan**

Effective January 1, 2019, Plaintiffs Michelle Z., Bo Z., and A.Z. became members of a Blue Shield Bronze 60 PPO Individual and Family Plan (the "IFP"), issued by Blue Shield. BSC008532-BSC008689.[3]

On the first page of the IFP's Evidence of Coverage and Health Service Agreement, the fifth paragraph following the language "**PLEASE READ THE FOLLOWING IMPORTANT NOTICES ABOUT THIS HEALTH PLAN**" reads:

> **Notice About Out-of-Area Covered Health Care Services:** This plan provides limited coverage for health care services received outside of California as of January 1, 2019.  Out-of-Area Covered Health Care Services are restricted to Emergency Services, Urgent Services, and Out-of-Area Follow-up Care.  No other services will be covered outside of California unless prior authorized by Blue Shield.  You will be financially responsible for any services received outside of California that are not Out-of-Area Covered Health Care Services or prior authorized by Blue Shield.  You have other ways to access health care when you are out of state.  Your plan includes Teladoc, a service that enables you to call or video chat with a doctor 24/7.  Additionally, you have anytime access to health care advice from a nurse via phone or your Blue Shield online account with NurseHelp 24/7.
>
> Please see the *Out-of-Area Services* section for additional information.  If you have questions about this notice and your Benefits, please contact Customer Service at the number provided on the back page of this Evidence of Coverage and Health Service Agreement.

BSC008534-BSC008535 (bold and italics in original).

Under the section of the IFP addressing out-of-area services, the "**Overview**" portion

---

any conclusions of law are inadvertently labeled as findings of fact (or vice versa), the findings and conclusions shall be considered in [their] true light, regardless of the label that the . . . court may have placed on [them]."  *Rodriguez v. Barrita, Inc.*, 62 F. Supp. 3d 936, 938 n.1 (N.D. Cal. 2014) (alterations in original; internal quotations and citation omitted).

[3] All references to the documents Bates labelled with the "BSC" prefix are to the documents comprising the administrative record ("AR"), attached as Exhibit A to the Declaration of Jennfer Garrison in Support of Defendants' Motion for Summary Judgment, or Alternatively, Summary Adjudication.  Dkt. Nos. 49-4, 49-5, 49-6, 49-7, 49-8, 49-9, 49-10, 49-11.

reads:

> Blue Shield has a variety of relationships with other Blue Cross and/or Blue Shield licensees. Generally, these relationships are called Inter-Plan Arrangements[4] and they work based on rules and procedures issued by the Blue Cross Blue Shield Association. Whenever you receive health care services outside of California, the claims for those services may be processed through one of these Inter-Plan Arrangements described below.
>
> When you access health care services outside of the Plan Service Area, you will receive the care from one of two kinds of providers. Most providers are participating providers and contract with the local Blue Cross and/or Blue Shield licensee in that other geographic area (Host Blue). Some providers are non-participating providers because they don't contract with the Host Blue. Blue Shield's payment practices in both instances are described below and in the *Choice of Providers* section of this Evidence of Coverage.
>
> This Blue Shield plan provides limited coverage for health care services received outside of the Plan Service Area. Out-of-Area Covered Health Care Services are restricted to Emergency Services, Urgent Services, and Out-of-Area Follow-up Care. Any other services will not be covered when processed through an Inter-Plan Arrangement unless prior authorized by Blue Shield. Please see the *Benefits Management Program* section for additional information on prior authorization and emergency admission notification.

BSC008560-BSC008561 (bold and italics in original).

The IFP defines "**Out-of-Area Covered Health Care Services**" as "Medically Necessary Emergency Services, Urgent Services, or Out-of-Area Follow-up Care provided outside the Plan Service Area." BSC008676 (bold in original). "**Emergency Services**" are "the following services provided for an Emergency Medical Condition:"

> 1) A medical screening examination that is within the capability of the emergency department of a hospital, including ancillary services routinely available to the emergency department to evaluate the Emergency Medical Condition; and
>
> 2) Such further medical examination and treatment, to the extent they are within the capabilities of the staff and facilities available at the hospital, to stabilize the Member.

BSC008672-BSC008673. The section defining "**Medical Necessity (Medically Necessary)**"

---

[4] "**Inter-Plan Arrangements**" are "Blue Shield's relationships with other Blue Cross and/or Blue Shield licensees, governed by the Blue Cross Blue Shield Association." BSC008674.

reads:

> Benefits are provided only for services that are Medically Necessary.
>
> 1) Services that are Medically Necessary include only those which have been established as safe and effective, are furnished under generally accepted professional standards to treat illness, injury or medical condition, and which, as determined by Blue Shield, are:
>
>> a) consistent with Blue Shield medical policy;
>>
>> b) consistent with the symptoms or diagnosis;
>>
>> c) not furnished primarily for the convenience of the patient, the attending Physician or other provider; and
>>
>> d) furnished at the most appropriate level which can be provided safely and effectively to the patient.
>
> 2) If there are two or more Medically Necessary services that may be provided for the illness, injury or medical condition, Blue Shield will provide Benefits based on the most cost-effective service.
>
> 3) Hospital inpatient services which are Medically Necessary include only those services which satisfy the above requirements, require the acute bed-patient (overnight) setting, and which could not have been provided in the Physician's office, the outpatient department of a Hospital, or in another lesser facility without adversely affecting the patient's condition or the quality of medical care rendered.  Inpatient services that are not Medically Necessary include hospitalization:
>
>> a) for diagnostic studies that could have been provided on an outpatient basis;
>>
>> b) for medical observation or evaluation;
>>
>> c) for personal comfort;
>>
>> d) in a pain management center to treat or cure chronic pain; and
>>
>> e) for inpatient Rehabilitative Services that can be provided on an outpatient basis.
>
> 4) Blue Shield reserves the right to review all claims to determine whether services are Medically Necessary, and may use the services of Physician consultants, peer review committees of professional societies or Hospitals, and other consultants.

BSC008674-BSC008675 (bold in original).

An "**Emergency Medical Condition (including a psychiatric emergency)**" is "a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) such

4

that the absence of immediate medical attention could reasonably be expected to result in any of the following: 1) placing the Member's health in serious jeopardy; 2) serious impairment to bodily functions; 3) serious dysfunction of any bodily organ or part."  BSC0008672 (bold in original).  "**Urgent Services**" are:

> those Covered Services[5] rendered outside of the Plan Service Area[6] (other than Emergency Services) which are Medically Necessary to prevent serious deterioration of a Member's health resulting from unforeseen illness, injury, or complications of an existing medical condition, for which treatment cannot reasonably be delayed until the Member returns to the Plan Service Area.

BSC008681(bold in original).  "**Out-of-Area Follow-up Care**" consists of "non-emergent Medically Necessary services to evaluate the Member's progress after Emergency or Urgent Services provided outside the Plan Service Area."  BSC008676 (bold in original).

Under the IFP, "[p]rior authorization allows the Member and provider to verify with Blue Shield or Blue Shield's MHSA [Mental Health Service Administrator] that (1) the proposed services are a Benefit of the Member's plan, (2) the proposed services are Medically Necessary, and (3) the proposed setting is clinically appropriate."  BSC008563.  This "process also informs the Member and provider when Benefits are limited to services rendered by Participating Providers or MHSA Participating Providers (See the Summary of Benefits)."  *Id.*

The section addressing "**Prior Authorization for Mental Health, Behavioral Health, or Substance Use Disorder Hospital Admissions and Other Outpatient Services**" reads:

> Prior authorization is required for all non-emergency mental health, behavioral health, or substance use disorder Hospital admissions including acute inpatient care and Residential Care.  The provider should call Blue Shield's Mental Health Service Administrator (MHSA) at 1-877-263-9952 at least five business days prior to the admission.  Other Outpatient Mental Health Services and Behavioral Health Treatment, and Outpatient Substance Use Disorder Services, including but not limited to, Behavioral Health Treatment (BHT),

---

[5] "**Covered Services (Benefits)**" are "those Medically Necessary services and supplies which a Member is entitled to receive pursuant to the terms of this Agreement."  BSC008670 (bold in original).

[6] The "**Plan Service Area**" is "that geographic area served by the Plan."  BSC008677 (bold in original).  As the parties confirmed during the motion hearing, the Plan Service Area for the IFP is California, with some exceptions.

United States District Court
Northern District of California

1

Partial Hospitalization Program (PHP), Intensive Outpatient Program (IOP), electroconvulsive therapy, Office-Based Opioid Detoxification and/or Maintenance Therapy, Psychological Testing and Transcranial Magnetic Stimulation (TMS) must also be prior authorized by the MHSA.

If prior authorization was not obtained for an inpatient mental health, behavioral health, or substance use disorder Hospital admission or for any Other Outpatient Mental Services and Behavioral Health Treatment, or Outpatient Substance Use Disorder Service, and the services provided to the Member are determined not to be a Benefit of the plan, or were not Medically Necessary, coverage will be denied.

For an authorized admission to a Non-Participating Hospital or authorized Other Outpatient Mental Health Services, and Behavioral Health Treatment, and Outpatient Substance Use Disorder Services from a Non-Participating Provider, the Member is responsible for applicable Deductible, Copayment, and Coinsurance amounts and all charges in excess of the Allowable Amount.

Prior authorization is not required for an emergency mental health, behavioral health, or substance use Hospital admission[.] See the Emergency *Admission Notification* section for additional information.

BSC008565 (italics in original).

The section of the IFP addressing "**Mental Health, Behavioral Health, and Substance Use Disorder Benefits**" reads, in part:

Blue Shield's Mental Health Service Administrator (MHSA) arranges and administers Mental Health Services, Behavioral Health Treatment, and Substance Use Disorder Services for Blue Shield Members within California. See the *Out-Of-Area Program, BlueCard Program* section for an explanation of how payment is made for out of state services.

All Non-Emergency inpatient Mental Health Services, Behavioral Health Treatment, and Substance Use Disorder Services, including Residential Care must be prior authorized by the MHSA. Other Outpatient Mental Health Services, Behavioral Health Treatment, and Outpatient Substance Abuse Use Disorder Services are subject to the Benefits Management Program and must be prior authorized by the MHSA. See the Benefits Management Program section for complete information.

BSC008576 (italics in original).

///

///

///

6

**B.      A.Z.'s Treatment History**

1.      Evolve

A.Z. has a history of suicide attempts.  BSC000438.  During an attempt in August 2018, A.Z., who was fourteen years old at the time, cut their wrists.  *Id.*  After that incident, A.Z. was admitted to Evolve Growth Initiatives in California.  *Id.*; BSC000445. A.Z. was diagnosed with mild recurrent major depressive disorder, generalized anxiety disorder, and social pragmatic community disorder.  BSC000438.

On January 4, 2019, Blue Shield approved Plaintiffs' request for preauthorization for Evolve's intensive outpatient program ("IOP"),[7] for 9 days, from January 2, 2019 to January 21, 2019, at the out of network level of benefit.  BSC000405, BSC000438, BSC008326.  On January 22, 2019, Blue Shield approved additional days, from January 22, 2019 through January 28, 2019. A.Z. was admitted to the IOP on January 2, 2019 and discharged from program on January 28, 2019.  BSC000403, BSC000405.

2.      Elevations

On May 23, 2019, a staff member from the Elevations Residential Treatment Center in Utah called Blue Shield twice to confirm out-of-state benefits for mental health coverage. BSC008721.  The relevant customer service notes read:

> **Caller**: Tamara F. ELEVATIONS
> DATE: 5/23/2019
> TMR # 1008979375-M
> **CCA** David L.
>
> **Provider Network Status Inquiry**
> oon /Utah
> ELEVATIONS RTC
> TIN: 465223208 - MIS: 600947604
> 2650 W 2700 S - (801) 773-0200
> SYRACUSE, UT 84075

---

[7] "Mental health conditions generally are treated in a range of settings referred to as 'levels of care.' Five commonly recognized levels of care, from most to least restrictive, are (1) inpatient treatment, (2) residential treatment, (3) partial hospitalization treatment, (4) intensive outpatient treatment, and (5) general outpatient treatment."  *See Josef K. v. Cal. Physicians' Serv.*, 477 F. Supp. 3d 886, 900 n.15 (N.D. Cal. 2020).

United States District Court
Northern District of California

1

>**Eligibility/Benefits Inquiry**:
>staff called to get out of state benefits for mental health, pt
>does not have this benefit under [their] coverage
>
>**Caller**: Tamara F. ELEVATIONS
>DATE: 5/23/2019
>TMR # 1008979468-M
>**CCA** Sylvana R.
>
>**Eligibility/Benefits Inquiry**:
>Verified MBR eligibility.  MBR MH benefit plan
>Managed by MHSA.
>Offered website and Advised we are available 24 hours a day
>7 days a week for emergencies.
>Verified NO OOS benefits.

2

3

4

5

6

7

8

9   *Id.* (formatting in original).[8]

10          On May 28, 2019, A.Z. was admitted to Elevations.  BSC008438.  The initial psychiatric

11   evaluation completed on A.Z.'s admission date notes the following history:

12

>[A.Z.] presents to Elevations Residential Treatment Center as a
>fifteen-year-old ninth grade student, after failure to successfully step
>down from higher acuity settings.  [A.Z.] has a history of being
>placed at UCLA briefly for suicidal ideation, followed by residential
>programming that was gradually stepped down to lower acuity
>programming at Evolve within the past year.  Generally, records
>corroborate a diagnostic formulation of severe depression with
>possible psychotic features, severe anxiety with social and OCD
>traits predominating, social pragmatic communication disorder, and
>relational difficulties.  More recently, [A.Z.] has reported a
>traumatic incident and came out to their parents on gender and
>sexuality related issues.  Family history appears to potentially
>increase risk for bipolar and other personality differences.  Upon
>admission, there does not seem to be significant medical, head
>injury, or substance predisposition to mental illness.

13

14

15

16

17

18

19

20   *Id.*

21

---

22   [8] In their opposition and cross-motion, Plaintiffs question why Blue Shield did not provide
transcripts, audio, or identifiable internal Blue Shield notes from these calls.  *See* Plaintiffs'
23   Amended Opposition to Motion for Summary Judgment and Cross Motion for Summary
Judgment, or in the Alternative for Leave to Conduct Discovery ("Opp.") (Dkt. No. 52) at 13-14.
24   Those were topics to explore during the discovery period that, as discussed later in this order, the
parties jointly proposed, and the Court approved.  Plaintiffs also argue that "Blue Shield's attempt
25   to weaponize the limitations on out-of-state coverage and its attempts to spin multiple prior
authorization calls into a justification for claim denials, leave no doubt that Blue Shield treated
26   Plaintiff unreasonably, warranting summary judgment for Plaintiff on the breach of contract, bad
faith, and ERISA claims."  Opp. at 15.  This ignores that different standards apply to the different
27   claims Plaintiffs assert in this action, and it ignores, as Blue Shield confirmed at oral argument,
that the Montefiore Plan in fact covers in-state and out-of-state inpatient mental health services,
28   and that benefits were denied under that plan for lack of medical necessity, not failure to obtain
prior authorization.

The review of A.Z.'s mood and anxiety reads:

> Generally records and patient/family informants note that depressive symptoms have amplified considerably over the last eighteen months.  There does not appear to be a history of mania/hypomania, though longstanding periodic insomnia does appear to be a significant portion of the formulation.  [A.Z.] has a history of struggling socially, finding it difficult to maintain or make peer relationships, with the subsequent history of being bullied.  Parents feel that [A.Z.] was generally happier until the preceding eighteen months, when anxiety and depression symptoms amplified considerably.  Prior to that, [A.Z.] acknowledges that there's been more longstanding OCD pathology, which "I've worked through much of it, but I continue to have some things like perfectionism and having to cancel a touch out if I rub something".  Parents note that [A.Z.] struggled to acknowledge these symptoms but has been seeing both OCD specialists and other therapists with significant frequency over recent years.  [A.Z.] has acknowledged chronic suicidal thoughts, though currently reports that these have reduced since the residential setting, but they have continued to have periodic self harm in a pattern of "every day, a lot, for like a week, and then there might be a few weeks where I don't".  Self-harm has generally included cutting and eraser burns.  Recent stressors include [A.Z.] coming out to parents as "gay" and "non binary".  Family acknowledges struggling on some level to accept these identity aspects, but are trying to be affirming.  [A.Z.] notes that they came out to their mother within the last month and father within the last week or so.  [A.Z.] reports, "I had always thought that something was different, but I didn't really put a lot of thought into it, but when I was in my last residential place I met people who identified outside the norm and I realized that that might fit for me".  [A.Z.] notes preferring they/them pronouns and recently asked for their name to be [A.Z.] "because it can be a name for both males and females".  They described their gender identity as "basically having aspects of both male and female".  They define "gay" as "I like girls".  Likewise, [A.Z.] ran away within the last month, and was gone for thirty hours, noting "I told my therapist that my brother had pushed me against a wall and it felt like an assault that I feel was sexual in nature".  "So the therapist called DCFS and I thought child protected services was coming out to interview me and I didn't want to do that".  [A.Z.] did not report that any type of penetration occurred, but was held against a wall against their will.  General report was very superficial and further information gathering on this event that [A.Z.] reports with further understanding of the extent of which Child Protective Services is being involved will be an ongoing matter.  [A.Z.] minimizes other traumatic events beyond feeling bullied throughout their life.  Social anxiety and generalized anxiety appear to be predominating features in terms of emotional standing, with difficulty in groups and making/maintaining friendships.  OCD characteristics have been long recognized and records generally give a better sense of the extent of symptoms, which will not be duplicated here. [A.Z.] currently denies suicidal, self-harm, AWOL, or homicidal ideation.

1  BSC008438-BSC008439.  A.Z.'s chief complaint was noted as "I don't really think I need to be

2  here."  BSC008438.

3          On October 30, 2019, A.Z. was discharged from Elevations by their parents, who stated

4  that they were "making th[e] change so that [A.Z.] c[ould] have more outdoor time and so that

5  they c[ould] be in [a] more positive environment that feels more 'homey.' "  BSC008689,

6  BSC008693, BSC008694.

7          A.Z. was discharged against the recommendation of Elevations.  The discharge notes

8  indicate "[i]t was recommended to [A.Z.'s] parents that [A.Z.] remain in the current facility as

9  [A.Z.] ha[d] made improvements in their treatment and ha[d] developed a therapeutic rapport with

10  milieu and clinical staff necessary for effective change."[9]  BSC008694.  A.Z.'s discharge

11  diagnoses included:  major depressive disorder, recurrent episode, with psychotic features,

12  unspecified anxiety disorder (OCD, social generalized, possible PTSD traits), social (pragmatic)

13  communication disorder, parent-child relational program, sibling relational problem, peer

14  relational problem.  BSC008689.

15                  3.    New Haven

16          On October 30, 2019, A.Z. was admitted to New Haven Residential Treatment Center in

17  Utah.  BSC000443.  The next day, a staff member from New Haven called Blue Shield.

18  BSC000402.  The notes from that call read:

19              I and A completed.  Provider staff Carolyn D (760)385-3367 from
                OON OOS New Haven Treatment Center called to request pre-auth
20              for RES MH for an adol.  CM reviewed mbr benefits and mbr does
                not have benefits for OOS RES MH.  CM staffed with CAT
21              Stephanie and informed caller that mbr does not have benefits for an
                OOS OON RES MH facility.  Caller stated she understood and had
22              no further requests.

23  *Id.*

24          A progress note dated January 9, 2020 from an individual therapy session at New Haven

25  documented A.Z.'s reports of having "no appetite," "not sleeping well, having intrusive thoughts,

26

27  ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯
    [9] On February 26, 2020, A.Z. reported to their therapist at New Haven that their time at Elevations
28  "did damage to" them.  BSC001743.

United States District Court
Northern District of California

1   [and] urges to hurt people." BSC011369.  The notes summarized the following from A.Z.'s

2   journal: "having panic attacks and would go outside--difficulty remembering--due to intrusive

3   thoughts.  After the thoughts slow down, [they] will get into a deeper discussion--some gender

4   dysphoria--attempts to not gain weight to not look 'feminine.' " *Id.*

5          A progress note dated January 22, 2020 states:

6                 [A.Z.] is struggling with high impulses to self harm.  [They] ha[ve]
                  been actively engaged in trying to burn [themselves] and talked
7                 about things that [they are] going through.  [A.Z.] reflected on
                  [their] family session yesterday and admitted that it was difficult for
8                 [them] to hear [their] parents say they are disappointed in the way
                  that [A.Z.] is behaving.  [A.Z.] reported that [they are] dealing with
9                 this guilt and trying to resist [their] own compulsions.  [A.Z.] looked
                  at how the desire to self harm could be an obsessive thought and
10                [A.Z.] is the one that needs to decide when [they] will resit [*sic*] the
                  compulsion.  [A.Z.] was validated for sharing authentic emotions
11                and was offered support and validation for just being authentic[.]

12  BSC002047.

13         A note from January 25, 2020 states:

14                Std[10] seemed to gave [*sic*] a low affect during shift.  Std did well at
                  letting staff know when [they] w[ere] experiencing anxiety or wanting
15                to self-harm.  Std asked staff to put their hand on [theirs] when [they]
                  wanted to self-harm.  Std wanted to go off campus to sled, and seemed
16                upset when rec therapist would not allow [them] to do so[.]

17  BSC002026.

18         A note from February 25, 2020 states:

19                Std had staff read the paragraph [from a letter [A.Z.] received from
                  their parents] that brought up the most emotion for [them].  Std said
20                that at first [they] disagreed with their statement that [they] w[ere]
                  attention seeking and nows [*sic*] understand[s] that [their] self-harm
21                demands attention.  Staff shared how they thought that [their]
                  parents were letting out emotions that they have probably kept in for
22                awhile [*sic*] and need to express to be able to move on[.]

23  BSC001751.

24         A note from May 15, 2020 states A.Z.:

25                Was out of class for all of advisory and for most of last period.
26                Experienced an anxiety attack and took a while to calm down.  Was
                  with staff PG the entire time.  Std. was feeling anxious and felt like
27

28  ─────────────────────
    [10] "Std" is not defined or explained by the parties.  The Court assumes it refers to A.Z.

                                              11

> self-harming and was in [their] core issue of believing that [they are] stupid and of negative self-image. Also expressed anxiety that [their] birthday is on Monday and it will mark "another year of depression".

BSC001080.

During a May 29, 2020 individual therapy session:

> [A.Z.] talked about the anxiety that [they were] feeling about [their] home pass and the issues that are coming up for [them]. [A.Z.] shared that [they are] having a great deal of sensory issues and ha[ve] a low appetite. [A.Z.] was asked to talk about who [they were] letting take charge. [A.Z.] expressed that [they were] not sure and did not feel totally in control. [A.Z.] and [their] therapist practiced skills to help [them] manage [their] symptoms[.]

BSC000964.

A progress note from June 3, 2020 states:

> Std seemed to be worried about upcoming home pass. Std observed to say [they were] contemplating sabotaging homepass[11] by self harming and seemed open to explore initially, once staff checked in with feelings of lonely [sic], std seemed to check out and admitted having a hard time focusing on conversation. Staff reported to therapist and std observed to check in with therapist during lunch.

BSC003209.

Treatment team updates from September 1, 2020 state that A.Z. was "trying to make a plan for their life and trying to figure out what their next step will be after New Haven. [A.Z.] has been opne [sic] to ideas and suggestions from [their] therapist and [their] peers."

A progress note from an individual therapy session held on October 29, 2020, states:

> [A.Z.] shared that they want their parents to consider taking them home after treatment. This is not something that [A.Z.] has wanted to do in the past and they indicated that they feel they are in a good place and want the opportunity. [A.Z.] looked at ways they can advocate for themselves and talk to parents.

BSC006998.

---

[11] A nursing note dated June 30, 2020 indicates that "[s]taff reported to nurses that std had harmed [them]self." BSC002982. A note from later that day indicated that A.Z. "was having urges to do things but wasn't acting on them." BSC002983. A progress note from a family therapy session held on July 21, 2020 states that A.Z. "sabotaged" the scheduled home pass. BSC002946.

United States District Court
Northern District of California

Notes from a session held December 31, 2020 indicate:

> Home pass was good, did have some disturbing nightmares while at home.  Continues to have memories return.  Not struggling too much with the intrusive thoughts.  [A.Z.] has been sleeping a little better since returning from the home pass--but sleep is still interrupted by nightmares.

BSC012470.[12]  The psychiatrist who held the session indicated that:

> Writer observes/[A.Z.] continues to report on the following symptoms and behaviors demonstrating the continued need for RTC level of care; Mood symptoms included: Anxiety, , Depressed/irritable mood, and Obsessions related to troubling aggressive thoughts, urges, or images[.]

*Id.* (punctuation and formatting as set forth in original).

A progress note from another individual therapy session held January 6, 2021 states:

> [A.Z.] checked in about their Christmas pass.  [A.Z.] reported that they struggled being at home and were triggered several times by things that would happen as they would go places.  [A.Z.] seem[ed] to remember and recall more information about their trauma as they went through their city.  [A.Z.] reported that they were unable to sleep in their own bed and parents allowed [A.Z.] to sleep on the floor in their room.  [A.Z.] enjoys being at home with their family however finds it difficult to fit in and always feels like they can't be themselves.

BSC004260.  The therapist who authored the note stated:

> Writer observes/[A.Z.] continues to report on the following symptoms and behaviors demonstrating the continued need for RTC level of care; Functional Impairments: Impaired social relationships, and Inability to live without support, . Personality Symptoms:

---

[12] Blue Shield covered the services New Haven provided during 2020 under the Montefiore Plan, which is discussed later in this order.  As the parties confirmed during oral argument, with respect to the Montefiore Plan, the only disputes pertain to services rendered January through April 2021 at New Haven, for which Blue Shield denied benefits.  With respect to the IFP Plan, the only disputes pertain to coverage denied for services rendered from May 23, 2019 through October 30, 2019 at Elevations and from October 31, 2019 through December 31, 2019 at New Haven.  Those services were denied as being "excluded" from the IFP.  BSC000291, BSC000297, BSC000305.  Blue Shield defended that determination during Plaintiffs' appeal to the Department of Managed Health Care ("DMHC"), which found in Blue Shield's favor, without regard to the prior authorization language at the core of the dispute presented here.  BSC008298-BSC008300, BSC016309, BSC016317, BSC016318.  Because, during the hearing, Blue Shield has reframed the dispute as one pertaining to whether the care falls within a coverage provision, rather than an exclusion, the Court does not put any weight on the DMHC's determination, nor does the Court address the parties' arguments as to the effect of any purported exclusion.

> Needing reassurance to make decisions, and Shallow expression of
> emotions, . Limitations in home support. Lower levels of care failed
> to alleviate the symptoms, and Unavailable/inappropriate support
> systems, Mood symptoms included: Anxiety, , Apprehension, ,
> Compulsions about arranging object, , Excessive guilt, and Loss
> appetite, . Physical Symptoms: Excessive energy/fidgeting, , Hyper-
> vigilance/paranoia, and Inappropriate behaviors to prevent weight
> gain (purging, laxatives, medications, fasting, excessive exercise)[.]

*Id.* (punctuation and formatting in original).

Notes from an individual therapy session held on January 29, 2021,[13] indicate in the

"Description of Session" portion:

> I'm going to asked [*sic*] to do individual therapy at a different time.
> [A.Z.] was getting ready to go to work and didn't want to do an
> emotional session and then have to go to their job.  [A.Z.] was
> offered session again over the weekend and the client.  Therapist
> and Student did have opportunities over the weekend to check in
> through text[.]

BSC004015.  The therapist preparing the notes recorded the following:

> Writer observes/[A.Z.] continues to report on the following
> symptoms and behaviors demonstrating the continued need for RTC
> level of care;
>
> Functional Impairments: Impaired social relationships, and Inability
> to live without support, . Personality Symptoms: Needing
> reassurance to make decisions, and Shallow expression of emotions,
> . Limitations in home support. Lower levels of care failed to
> alleviate the symptoms, and Unavailable/inappropriate support
> systems, Mood symptoms included:Anxiety, , Apprehension, ,
> Compulsions about arranging object, , Excessive guilt, and Loss
> appetite, . Physical Symptoms: Excessive energy/fidgeting, , Hyper-
> vigilance/paranoia, and Inappropriate behaviors to prevent weight
> gain (purging, laxatives, medications, fasting, excessive exercise), .
>
> **Plan:**
> [A.Z.] will be off for two individual sessions next week as parents
> have decided to take a break while [A.Z.] works through some of
> their trauma[.]

*Id.* (punctuation as set forth in original).

///

///

---

[13] A residential progress note from a few days earlier indicated that A.Z. exhibited "age appropriate behavior" at a New Haven event held on or about January 25, 2021.  BSC013334.

Notes from an individual therapy session signed February 1, 2021 indicated that A.Z.'s therapy plan was to "[c]ontinue offering a [*sic*] support in a safe place for [A.Z.] to express themselves." BSC004193.

Notes from an individual therapy session held February 25, 2021 indicate that A.Z. "[wa]s opening up to counselor as rapport [wa]s built[,]" and the plan was to continue to build rapport. BSC003829.

Treatment notes from April 26, 2021 listed dates throughout the latter half of 2020 as "date[s] of completion" for all A.Z.'s and their parents' identified "problems." BSC009664-BSC009665. With respect to A.Z. specifically, objectives related to their "Low Self Esteem," show a date of completion of August 26, 2020. BSC009664. The objectives related to their "Lack of connection to emotional self," show dates of completion of August 26, 2020 and November 23, 2020. *Id.* The objectives related to their "Lack of Authenticity" show dates of completion of August 26, 2020 and November 16, 2020. *Id.*

A.Z. was discharged from New Haven on April 28, 2021. BSC000447. Additional portions of the record are discussed later in this order as relevant to the Court's analysis.

## C.    The Montefiore Plan

On January 1, 2020, A.Z.'s new group coverage began under a Blue Shield Bronze Full PPO 6850/65 OffEx policy (the "Montefiore Plan"). BSC008146. The Montefiore Plan covers both in-area and out-of-area mental health treatment if the services are "Medically Necessary." As set forth in the plan:

> Benefits are provided only for services that are Medically Necessary.
>
> 1) Services that are Medically Necessary include only those which have been established as safe and effective, are furnished under generally accepted professional standards to treat illness, injury or medical condition, and which, as determined by Blue Shield, are:
>
> a) consistent with Blue Shield medical policy;
>
> b) consistent with the symptoms or diagnosis;
>
> c) not furnished primarily for the convenience of the patient, the attending Physician or other provider;
>
> d) furnished at the most appropriate level which can be provided

United States District Court
Northern District of California

safely and effectively to the patient; and

e) <u>not more costly than an alternative service or sequence of services at least as likely to produce equivalent therapeutic or diagnostic results as to the diagnosis or treatment of the Member's illness, injury, or disease</u>.

BSC008280 (emphasis in original). Under the Montefiore Plan, "Blue Shield reserves the right to review all claims to determine whether services are Medically Necessary, and may use the services of Physician consultants, peer review committees of professional societies or Hospitals, and other consultants." *Id.*

With respect to the treatment A.Z. received in January and February 2021, for which she sought coverage under the Montefiore Plan, Physician Advisor M. Geromni, D.O., indicated:

> [T]he requested service(s) would not be covered as medically necessary under the terms of this health plan per generally accepted standards of mental health and substance use disorder care criteria Child and Adolescent Level of Care Utilization System (CALOCUS).[14]

---

[14] CALOCUS is designed to help clinicians determine the appropriate level of mental health care for children and adolescents by scoring them across six "dimensions": (1) risk of harm; (2) functional status; (3) co-morbidity; (4) recovery environment; (5) resiliency and treatment history; and (6) treatment acceptance and engagement. BSC016320-BSC016361. "Children and adolescents with scores in the range of 23-27 generally may begin treatment at, or may be transitioned into," medically monitored residential services. BSC016340, BSC016342. A score of 4 or more in the risk of harm, functional status, or co-morbidity dimensions, which denotes a serious potential for risk of harm, a serious impairment in functional status, and major co-morbidity, requires admission to medically monitored residential services regardless of composite score. BSC016345, BSC016346.

Plaintiffs dispute whether Blue Shield applied the correct version of the CALOCUS guidelines, arguing that the 2020 version rather than 2019 version should have been used and additionally contending that the 2019 version on which Blue Shield relied was incomplete. Opp. at 27-31; Reply at 16-17. Plaintiffs' first argument is unconvincing. They offer no authority for the proposition that the 2020 version of the guidelines should have been applied or that the outcome would have been any different if Blue Shield had used the 2020 version of the guidelines. Plaintiffs' second argument, however, is well-taken. While the 2019 version of the guidelines contained in the administrative record includes all of the sections outlined in document's the table of contents, *see* BSC016320-BSC016361, two items are missing. First, a flow chart that is referenced in the guidelines is not included in the document. *See* BSC016324. Second, there are referenced "anchor points" that, while appearing to be hyperlinked, are not accessible within the administrative record, and are only accessible on a website "to those who register for use." BSC016328. The Court discusses the effect of these omissions when analyzing Plaintiffs' ERISA claim. However, the Court declines to consider the 2020 version of the guidelines Plaintiffs have submitted with their briefing, *see* Dkt. No. 52-1, because Plaintiffs did not seek to supplement the administrative record with the 2020 version or offer any authority that the 2020 version (as opposed to the 2019 version) should be applied.

16

The Physician Advisor's determination is: Deny.

Clinical Rationale: Your request for mental health residential treatment (MH-RTC) on January 01, 2021, through February 28, 2021, cannot be approved for payment.  The primary reason we cannot approve the request is because the medical records submitted did not show that mental health residential treatment (MH-RTC) to be medically necessary on January 01, 2021, through February 23, 2021.

The member participated in the treatment milieu as noted throughout the submitted clinical documentation.  There was no indication that the member was experiencing moderately severe or worse mental health symptoms that were causing serious deficits in their overall, daily functioning.  The member was not reported to endorse suicidal or homicidal ideation.  There were no reports of significant, current risks to self and/or others.  There were no reports of aggressive, violent, combative, or other dangerous or concerning behaviors at the facility.

As per the Child and Adolescent Level of Care Utilization Systern. (CALOCUS) it appears that treatment could have been provided in the less restrictive outpatient treatment setting on January 01, 2021, through February 28, 2021.

Mental health residential treatment (MH-RTQ) cannot be authorized for payment on January 01, 2021, through February 28, 2021, due to the lack of medical necessity, as outlined above.

BSC000153-BSC000154.

With respect to the treatment A.Z. received in March and April 2021, Physician Advisor S. Ghani, M.D., indicated:

[T]he requested service(s) would not be covered as medically necessary under the terms of this health plan per generally accepted standards of mental health and substance use disorder care criteria Child and Adolescent Level of Care Utilization System (CALOCUS).

The Physician Advisor's determination is: Uphold.

Clinical Rationale: PT does not meet CALOCUS (Child and Adolescent Level of Care Utilization System) criteria for DOS (Dates of Service) 3/1/2021-4/28/2021.  Discharge date unknown. 17 YO (year old) female to male transgender admitted RTC LOC (residential treatment center level of care) 10/31/2019.  Principal DX (diagnosis): F32.1: Major depressive disorder, single episode, moderate, Suffers from social phobia, OCD (obsessive completion disorder) recurrent, GAD (general anxiety disorder), ADHD (attention deficit hyperactivity disorder), Medical records are in the name of [A.Z.] (birth name) and the notes refer to them as [A.Z.] (They, Them, Their).  Reports HX (history) self-harm began 2018

when they came out to the family.  Self-harm increased at that time.  On admission taking Citalopram 40 mg, Risperidone 1.5mg  Compliant w medications.  Program meds (medications) incl (include) Seroquel, Risperidone, Trazadone.

Blue Shield uses guidelines created by the American Association for Community Psychiatry with American [A]ssociation of [C]hild and Adolescent Psychiatry (AACAP) (called the Child and Adolescent Level of Care Utilization System, or LOCUS) to find the best level of care needed to treat mental health problems.  The CALOCUS (Child and Adolescent Level Of Care Utilization System) guidelines look at how well the individual is doing in six areas (known as dimensions). These dimensions look at ones risk of harm, how well one can care for themselves, if they have any major illness, what their home environment is like, what their response was to past mental health treatments, and how well they are involved in their recovery. March & April 2021 recreational therapy group notes & residential progress notes: [A.Z.] and family actively working through sessions together.  [A.Z.] remains engaged and participates willingly.  There was no evidence of any self-harm ideation or thoughts of wanting to hurt others.  CALOCUS (Child and Adolescent Level Of Care Utilization System) criteria are not met for RTC (residential treatment center) level of care for the dates of service 3/1/2021 through 4/28/2021.

BSC000192-BSC000194.[15]

In a November 10, 2021 letter, Blue Shield's Medical Director Michael Millman, PhD,

stated:

After a review of the medical records and based on these

---

[15] The two reviews by Blue Shield's physicians contained in the record do not score A.Z. across the distinct dimensions comprising the CALOCUS guidelines, ignore the portions of treatment notes suggesting A.Z. still required inpatient care, and fail to take into account whether the improvement that shifted the CALOCUS guidelines in favor of less restrictive treatment would continue if A.Z. was removed from New Haven.  Indeed, even if A.Z. had improved while at the facility, continued treatment could still have been medically necessary.  *See Wiwel v. IBM Med. & Dental Ben. Plans for Regular Full-Time & Part-Time Emps.*, No. 5:15-cv-504-FL, 2018 WL 526988, at *4 (E.D.N.C. Jan. 18, 2018) (finding insurer's denial of benefits was erroneous because the insurer's reviewers had failed to evaluate whether improvements in the patient's symptoms would last if she was removed from residential treatment); *Charles W. v. Regence BlueCross BlueShield of Oregon*, No. 2:17-CV-00824-TC, 2019 WL 4736932, at *9 (D. Utah Sept. 27, 2019) ("Because Regence's reviewers did not appropriately consider the extent to which Zoe's stability was attributable to New Haven or explain why it would not get worse if she left New Haven, Plaintiffs have demonstrated by a preponderance of the evidence that Zoe's treatment at New Haven was medically necessary.").  The Court therefore gives greater weight to the opinions of the providers who actually treated and examined A.Z. than to physicians who only reviewed the case file.  *See Smith v. Hartford Life & Acc.*, No. C 11-03495 LB, 2013 WL 394185, at *24 (N.D. Cal. Jan. 30, 2013) ("Courts discount the opinions of psychiatrists who have never seen the patient for obvious reasons.  Unlike cardiologists or orthopedists, who can formulate medical opinions based upon objective findings derived from objective clinical tests, the psychiatrist typically treats his patient's subjective symptoms[.]").

> guidelines it was not medically necessary for you to receive residential treatment from January 1, 2021, and forward. The best level of care was treatment three to five half days a week and spending the nights and weekends at your home (intensive outpatient program, also called IOP). You did not need care 24 hours per day. You were not a danger to yourself or others. While you continued to have thoughts of self-harm at times, your overall risk was low, and could safely be managed in an IOP. You were cooperative in your treatment. You were using skills you had learned. You were able to participate in normal activities. Your communication with your parents had improved. You did not have any medical complications or problems with medication that would require continued residential care. You had been in residential care since October 30, 2019, and made significant improvement. Your care could have safely and effectively been provided in an intensive outpatient program.

BSC000937.[16]

### D.    This Litigation

On September 7, 2023, Plaintiffs filed their original complaint in this action in San Francisco Superior Court, asserting claims for breach of contract and breach of the covenant of good faith and fair dealing against Blue Shield. Dkt. No. 1-3. On November 9, 2023, Blue Shield removed the action to this Court. Dkt. No. 1. Following motion to dismiss briefing, the filing of a first amended complaint adding a cause of action for recovery of benefits due under ERISA, and mediation, the parties stipulated to allow Plaintiffs to file a second amended complaint.[17] Dkt. Nos. 11, 13, 17, 18, 19, 38, 40. Defendant filed an answer on July 25, 2024. Dkt. No. 41.

On August 13, 2024, the parties filed a joint case management conference statement. Dkt. No. 43. On August 15, 2024, the Court issued a scheduling order setting the following deadlines:

| Event | Deadline |
|---|---|
| **Last day to seek leave to add parties or** | September 12, 2024 |

---

[16] Other than as set forth in the denial letter quoted above, the Court has not considered the medical assessment of Blue Shield's medical reviewer Dr. Michael Millman. Blue Shield cites BSC008297 as the relevant document in the record containing Dr. Millman's assessment, but that page reference is to a slip sheet for a native document that was not provided to the Court in the administrative record on file as of the date of the hearing on the matter. As discussed below, the Court has not considered the errata Blue Shield filed after the matter was taken under submission and without seeking leave of Court.

[17] To date, Plaintiffs have failed to comply with the Court's order approving the parties' stipulation. The order directed Plaintiffs to "separately file the proposed Second Amended Complaint." Dkt. No. 40.

United States District Court
Northern District of California

| Event | Deadline |
|---|---|
| amend pleadings | |
| Close of fact discovery | February 28, 2025 |
| Parties to provide initial expert disclosure(s) and report(s) | March 17, 2025 |
| Parties to identify rebuttal expert(s) and provide rebuttal expert report(s) | March 31, 2025 |
| Close of expert discovery | April 28, 2025 |
| Defendant's summary judgment motion | May 12, 2025 |
| Plaintiff's combined cross-motion and opposition | June 2, 2025 |
| Defendant's combined opposition and reply | June 12, 2025 |
| Plaintiff's reply | June 19, 2025 |
| Initial proposed findings of fact and conclusions of law | July 18, 2025 |
| Hearing on cross-summary judgment motions and any Daubert motions | October 2, 2025 |
| Revised proposed findings of fact and conclusions of law | October 20, 2025 |

Dkt. No. 45.  The Court adopted the deadlines for the close of fact discovery, initial expert disclosures and reports, rebuttal expert disclosures and reports, the close of expert discovery, and opening and responsive briefs as jointly proposed by the parties.  *Compare* Dkt. No. 43 *with* Dkt. No. 45.

Blue Shield filed its motion for summary judgment or alternatively, summary adjudication, on May 12, 2025.  Motion for Summary Judgment, or Alternatively, Summary Adjudication ("MSJ") (Dkt. No. 48).  On May 27, 2025, Plaintiffs filed their opposition.[18]  Dkt. No. 51.  On June 2, 2025, Plaintiffs filed an amended opposition and cross-motion for summary judgment or, alternatively, for leave to conduct discovery pursuant to Federal Rule of Civil Procedure 56(d), with a supplemental declaration from counsel, David M. Lilienstein.  Opp.; Supplemental Declaration of David Lilienstein in Support of Opp. (Dkt. No. 52-1).[19]  Blue Shield filed its

---

[18] Each side filed motions to seal with their opening briefs, Dkt. Nos. 49, 50.  On September 25, 2025, the Court granted those motions.  Dkt. Nos. 60, 61.

[19] Footnote 1 to the amended opposition reads:

> This Amended Cross-Motion and Opposition supplants Dkt. No 51. Plaintiff erroneously followed the schedule contained in the original ECF Notice of Electronic Filing from May 12, 2025.  That schedule

1    combined reply in support of its motion and opposition to Plaintiffs' cross-motion on June 12,

2    2025, with a supporting declaration of Attorney Thomas R. Worger attesting to certain facts

3    relevant to Plaintiffs' request for leave to conduct additional discovery.  Reply in Support of

4    Motion for Summary Judgment, or, Alternatively, Summary Adjudication and Opposition to

5    Cross-Motion for Summary Judgment ("Def.'s Reply") (Dkt. No. 53); Declaration of Thomas R.

6    Worger in Support of Def.'s Reply ("Worger Decl.") (Dkt. No. 53-1).  Plaintiffs' reply followed

7    on June 19, 2025, attaching, for the first time, a declaration from Attorney Lilienstein addressing

8    the Rule 56(d) request.  Reply in Support of Cross-Motion for Summary Judgment, or in the

9    Alternative for Leave to Conduct Discovery ("Pl.'s Reply") (Dkt. No. 54); Declaration of David

10    Lilienstein in Support of Rule 56(d) Request for Additional Discovery ("Lilienstein Decl.") (Dkt.

11    No. 54-1).[20]  On June 26, 2025, Blue Shield filed objections to Lilienstein's declaration.

12    Objection to Reply Declaration of David Lilienstein in Support of Rule 56(d) Request for

13    Additional Discovery ("Def.'s Obj.") (Dkt. No. 55).  On July 18, 2025, each party filed its

14    proposed findings of fact and conclusions of law.  Dkt. Nos. 56, 57.  The Court held a hearing on

15    the parties' cross-motions on October 9, 2025.  Dkt. No. 63.

16          Following the hearing, Plaintiffs filed, at the Court's directive, a statement containing

17    "their points of argument previously presented in their papers concerning (1) the dispute of fact

18    regarding whether A.Z.'s treatment qualified as emergent or urgent, and (2) Plaintiffs' entitlement

19    to punitive damages upon a finding of bad faith."  Dkt. No. 64.  Contravening the Court's

---

            misstated the deadlines set forth in the Courts Case Management
            Scheduling Order, Doc. No. 45.  Accordingly, Plaintiff respectfully
            requests the court replace the prematurely filed Dkt. No. 51 with the
            instant filing.

Opp. at 6 n.1.  Though a footnote in a brief is not the proper vehicle by which to request the relief
Plaintiffs seek, the Court nonetheless treats the amended opposition as operative and has not
considered any materials filed solely in connection with the now-superseded original opposition.
These materials include the declaration of David M. Lilienstein, to which an exhibit comprised of
Plaintiffs private health information and records is attached, and the declaration of Tamra Foy.
Dkt. Nos. 51-1, 51-2, 51-3, which were not re-submitted with the amended declaration.

[20] The declaration filed with the now-superseded opposition did not attest to any facts relating to
the discovery request.  It only purported to authenticate an accompanying exhibit.  *See* Dkt. No.
51-1.

United States District Court
Northern District of California

1    instruction at the hearing, and after the matter was taken under submission, Blue Shield filed an

2    errata containing material that had been omitted from the administrative record on October 17,

3    2025.  Dkt. No. 65, 66.  Because Blue Shield did not seek leave of Court to file those materials,

4    the Court has only considered the materials properly on file as of the date of the hearing on this

5    matter.

6    **II.    LEGAL STANDARD**

7        **A.    State Law Claims**

8        A party may move for summary judgment on a "claim or defense" or "part of [a] claim or

9    defense."  Fed. R. Civ. P. 56(a).  Summary judgment is appropriate when there is no genuine

10   dispute as to any material fact, and the moving party is entitled to judgment as a matter of law.  *Id.*

11   The party seeking summary judgment bears the initial burden of informing the court of the basis

12   for its motion and identifying those portions of the pleadings and discovery responses that

13   demonstrate the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S.

14   317, 323 (1986).  Material facts are those that might affect the outcome of the case.  *Anderson v.*

15   *Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute as to a material fact is "genuine" if there

16   is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party.  *Id.*

17       Where the moving party will have the burden of proof at trial, it must affirmatively

18   demonstrate that no reasonable trier of fact could find other than for the moving party.

19   *Soremekun v. Thrifty Payless*, *Inc.*, 509 F.3d 978, 984 (9th Cir. 2007).  On an issue where the

20   nonmoving party will bear the burden of proof at trial, the moving party may carry its initial

21   burden of production by submitting admissible "evidence negating an essential element of the

22   nonmoving party's case," or by showing, "after suitable discovery," that the "nonmoving party

23   does not have enough evidence of an essential element of its claim or defense to carry its ultimate

24   burden of persuasion at trial."  *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.*, 210 F.3d

25   1099, 1106 (9th Cir. 2000); *see also Celotex*, 477 U.S. at 325 (moving party can prevail merely by

26   pointing out to the district court that there is an absence of evidence to support the nonmoving

27   party's case).

28       When the moving party has carried its burden, the nonmoving party must respond with

1   specific facts, supported by admissible evidence, showing a genuine issue for trial.  Fed. R. Civ. P.

2   56(c), (e).  But disputed facts must be material – the existence of only "some alleged factual

3   dispute between the parties will not defeat an otherwise properly supported motion for summary

4   judgment[.]"  *Anderson*, 477 U.S. at 247-48.  When deciding a summary judgment motion, a court

5   must view the evidence in the light most favorable to the non-moving party and draw all

6   justifiable inferences in its favor.  *Id.* at 255; *Hunt v. City of Los Angeles*, 638 F.3d 703, 709 (9th

7   Cir. 2011).  However, when a non-moving party fails to produce evidence rebutting the moving

8   party's showing, then an order for summary adjudication is proper.  *Nissan Fire*, 210 F.3d at 1103

9   ("If the nonmoving party fails to produce enough evidence to create a genuine issue of material

10  fact, the moving party wins the motion for summary judgment.").  The court's function on a

11  summary judgment motion is not to make credibility determinations or weigh conflicting evidence

12  with respect to a disputed material fact.  *See T.W. Elec. Serv., Inc., v. Pac. Elec. Contractors

13  Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

14          **B.      ERISA**

15          ERISA provides an employee a cause of action for the improper denial of benefits under an

16  employee welfare plan.  *See generally Moyle v. Liberty Mut. Ret. Ben. Plan*, 823 F.3d 948 (9th

17  Cir. 2016).  With respect to the ERISA claim, the parties have filed cross-motions for judgment

18  under Federal Rule of Civil Procedure 52.  "When presented with motions for judgment under

19  Federal Rule of Civil Procedure 52, the court conducts what is essentially a bench trial on the

20  record, evaluating the persuasiveness of conflicting testimony and deciding which is more likely

21  true."  *Rapolla v. Waste Mgmt. Emp. Benefits Plan*, No. 13-CV-02860-JST, 2014 WL 2918863, at

22  *4 (N.D. Cal. June 25, 2014) (internal quotations and citations omitted).  "[T]he factual

23  determination of eligibility for benefits is decided solely on the administrative record, and 'the

24  non-moving party is not entitled to the usual inferences in its favor.' "  *Gilliam v. Nevada Pwr.

25  Co.*, 488 F.3d 1189, 1192 n.3 (9th Cir. 2007) (internal quotations and citations omitted).

26          Here, the parties agree that a de novo standard of review applies.  "When conducting a de

27  novo review of the record, the court does not give deference to the claim administrator's decision,

28  but rather determines in the first instance if the claimant has adequately established that [they are]

United States District Court
Northern District of California

disabled under the terms of the plan." *Muniz v. Amec Constr. Mgmt.*, 623 F.3d 1290, 1295-1296 (9th Cir. 2010). The court "simply proceeds to evaluate whether the plan administrator correctly or incorrectly denied benefits . . . ." *Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 963 (9th Cir. 2006). "[T]he burden of proof is placed on the claimant." *Muniz*, 623 F.3d at 1294 (citation omitted). In other words, the plaintiff has the burden to show their claim falls within the scope of coverage. *Id.*

"Under the federal common law of ERISA," courts " 'interpret terms in ERISA insurance policies in an ordinary and popular sense as would a person of average intelligence and experience.' " *Padfield v. AIG Life Ins. Co.*, 290 F.3d 1121, 1125 (9th Cir. 2002) (internal quotations and citation omitted). The Ninth Circuit has adopted the "reasonable expectations" doctrine when interpreting ERISA contracts, which provides that "[i]n general, courts will protect the reasonable expectations of applicants, insureds, and intended beneficiaries regarding the coverage afforded by insurance carriers even though a careful examination of the policy provisions indicates that such expectations are contrary to the expressed intention of the insurer." *Saltarelli v. Bob Baker Grp. Med. Tr.*, 35 F.3d 382, 386 (9th Cir. 1994) (citing Robert E. Keeton & Alan I. Widiss, *Insurance Law: A Guide to Fundamental Principles, Legal Doctrines, and Commercial Practices* § 6.3 (1988)); *see also Kunin v. Benefit Tr. Life Ins. Co.*, 910 F.2d 534, 540 (9th Cir. 1990) (interpreting ambiguous provisions of an ERISA contract, "the insurer should be expected to set forth any limitations on its liability clearly enough for a common layperson to understand."). The Court must construe any ambiguities in the policy against the insurer and "adopt [a] reasonable interpretation advanced by [the insured.]" *See Lang v. Long-Term Disability Plan Sponsor of Applied Remote Tech., Inc.*, 125 F.3d 794, 799 (9th Cir. 1997).

## III.    DISCUSSION

Before turning to which party is entitled to judgment on Plaintiffs' ERISA claim, the Court addresses whether summary judgment is appropriate on Plaintiffs' state law claims for breach of contract and breach of the covenant of good faith and fair dealing,[21] beginning with the

---

[21] Plaintiffs also seek punitive or treble damages but point to no evidence in the record suggesting an entitlement to either. *See Delgado v. Heritage Life Ins. Co.*, 157 Cal. App. 3d 262, 277 (1984)

24

1    preliminary matter of whether Plaintiffs are entitled to conduct additional discovery on those

2    claims pursuant to Federal Rule of Civil Procedure 56(d).

3        **A.    State Law Claims**

4            1.   <u>Request for Leave to Conduct Additional Discovery</u>

5    Federal Rule of Civil Procedure 56(d) provides:

6            If a nonmovant shows by affidavit or declaration that, for specified
        reasons, it cannot present facts essential to justify its opposition, the

7            court may:
        (1) defer considering the motion or deny it;

8            (2) allow time to obtain affidavits or declarations or to take
        discovery; or

9            (3) issue any other appropriate order.

10    Fed. R. Civ. P. 56(d). "[A] district court should continue a summary judgment motion upon a

11    good faith showing by affidavit that the continuance is needed to obtain facts essential to preclude

12    summary judgment." *State of Cal. on Behalf of California Dep't of Toxic Substances Control v.*

13    *Campbell*, 138 F.3d 772, 779 (9th Cir. 1998). The party seeking additional discovery "must show

14    (1) that they have set forth in affidavit form the specific facts that they hope to elicit from further

15    discovery, (2) that the facts sought exist, and (3) that these sought-after facts are 'essential' to

16    resist the summary judgment motion." *Id.* "Failure to comply with these requirements is a proper

17    ground for denying discovery and proceeding to summary judgment." *Fam. Home & Fin. Ctr.,*

18    *Inc. v. Fed. Home Loan Mortg. Corp.*, 525 F.3d 822, 827 (9th Cir. 2008) (internal quotations and

19    citation omitted).

20    _____

21    ("The breach of the covenant of good faith and fair dealing in the context of disability insurance
does not . . . automatically warrant the imposition of punitive damages. To justify an award of

22    punitive damages, the insured must still establish that the insurer acted with the requisite quality of
intent to award punitive damages. To satisfy this requirement, the insured must prove that the

23    insurer wilfully and deliberately failed to take the steps necessary to avoid the adverse
consequences that the unwarranted denial of its claim would have.") (internal citations omitted);

24    *see also* Cal. Civ. Code § 3345 (authorizing treble damages "only in actions brought by, on behalf
of, or for the benefit of" senior citizens, disabled persons, and veterans "to redress unfair or

25    deceptive acts or practices or unfair methods of competition."). In their post-hearing submission,
Plaintiffs refer to "alleged misrepresentations" referenced in its briefing that they contend could

26    support a punitive damages award. *See* Dkt. No. 64 at 2-4. But as the party opposing Blue
Shield's motion for summary adjudication on this issue, Plaintiffs must do more than rely on

27    allegations. They must respond with specific facts, supported by admissible evidence, showing a
genuine issue for trial. Fed. R. Civ. P. 56(c). Plaintiffs have not done so. Accordingly, Blue

28    Shield's alternative motion for summary adjudication on the issue of punitive damages and treble
damages is **GRANTED**.

In the alternative to their motion for summary judgment on their state law claims, Plaintiffs:

> respectfully assert[] that good cause exists under Rule 56(d) to defer consideration of Blue Shield's motion to allow additional discovery regarding Blue Shield's claims handling practices and the missing audio recordings and internal documentation of the pre-admission telephone calls Blue Shield characterizes as "not prior authorization calls."

Opp. at 7.

Blue Shield opposes. Blue Shield first argues that, as it pointed out in its reply brief, Plaintiffs failed to attach the required supporting declaration to the opposition brief containing the request for discovery, opting instead to attach it to their reply. Def.'s Obj. at 2. Second, Blue Shield argues that even if the Court considered the belatedly filed supporting declaration, its contents do not establish the elements necessary to obtain relief under Rule 56(d). *Id.*

Both grounds Blue Shield raises warrant denial of Plaintiffs' request for additional discovery. Plaintiffs' attempt to shore-up the request by attaching a declaration to their reply brief, instead of submitting it with the opposition and cross-motion containing the request for additional discovery, is improper. *See, e.g.*, *Riverside Pub. Co. v. Mercer Pub. LLC*, No. C11-1249RAJ, 2013 WL 1346589, at *9 (W.D. Wash. Apr. 3, 2013) (denying Rule 56(d) request where moving party "provided no affidavit or declaration at all" and instead asked the court to rely on "an after-filed declaration it submitted in reply to [the plaintiff's] opposition to its Rule 56(d) request"); *see also Allen v. Chicago Transit Auth.*, No. 99 C 7614, 2000 WL 1139894, at *1 (N.D. Ill. Aug. 10, 2000) (declining to permit discovery under earlier version of the current Rule 56(d) where "[i]t was not until after the [defendant] filed its summary judgment reply pointing out that plaintiffs failed to attach a Rule 56(f) affidavit that plaintiffs moved to file the Rule 56(f) affidavit of . . . one of their attorneys"); *Teague v. Christian*, No. 4:18-cv-00052 DN, 2019 WL 4645386, at *2 (D. Utah Sept. 24, 2019) (denying request for discovery under Rule 56(d) request where "[p]laintiff failed to attach the affidavit required by Rule 56(d) . . . and instead attached it to [p]laintiff's reply memorandum").

Even if Plaintiffs had properly filed a supporting declaration with their opposition brief, they would nonetheless fail to meet the requirements for relief under Rule 56(d). The declaration

provides, in pertinent part:

2.    As part of Plaintiffs' Rule 56(d) request, Plaintiffs respectfully request the Court either deny Blue Shield's summary judgment motion in its entirety, or defer a ruling on Defendant's motion for summary judgment pending the completion of essential discovery and further briefing.

3.    On May 12, 2025, Defendant filed a motion for summary judgment.  As of the date of this filing, Plaintiffs did not have a fair opportunity to complete discovery needed to adequately oppose that motion and or [*sic*] Defendant raised issues in its summary judgment motion that require additional discovery.

4.    Specifically, Plaintiffs require discovery, through depositions or document audio file requests, into the following factual issues, which are directly relevant to the claims and defenses at issue in Defendant's motion:

- Preauthorization request telephone calls from staff at Elevations and New Haven to Blue Shield;
- How Blue Shield trains its telephone operators to take preauthorization calls for out-of-state claims, including but not limited to out-of-state claims for residential treatment;
- What entity—Blue Shield or its mental health services administrator—actually took the preauthorization calls that are at issue in Defendant, and all related training and training manuals;
- The lack or insufficiency of any internal notes concerning the preauthorization calls that are at issue in this litigation;
- Changes in individual family plan language, including actuarial bases for said changes, related to the out-of-state exclusions that are at issue in this action generally, and specifically in Defendant's summary judgment motion;
- The number of out-of-state residential treatment claims that Blue Shield and or its mental health services administrator does approve and the related claims handling;
- How Blue Shield determines medical necessity, urgency or emergency in claims for residential treatment; and
- How differently Blue Shield treats claims under individual policies versus ERISA plans.

5.    This discovery is essential to demonstrate there is ample evidence to enter judgment for Plaintiffs, or, in the alternative to deny Blue Shield's summary judgment motion.

6.    Plaintiffs are not seeking delays for any improper purpose.  This request is made in good faith and is supported by

1   good cause, as Plaintiffs cannot present essential facts to justify its
    opposition without the discovery identified above.

2          7.      Accordingly, Plaintiffs respectfully request that the
    Court:

3          a.  Deny or defer ruling on the motion for summary
               judgment pursuant to FRCP 56(d);

4          b.  Permit discovery on the issues identified above; and

5          c.  Allow Plaintiffs a reasonable period of time (e.g., 90
               days) to complete such discovery and file a

6              supplemental opposition.

7   Lilienstein Decl. ¶¶ 2-7.  The sworn assertions recited above fall short of providing "[(1)] the

8   specific facts that [Plaintiffs] hope to elicit from further discovery, (2) that the facts sought exist,

9   and (3) that these sought-after facts are 'essential' to resist the summary judgment motion."  *See*

10  *Campbell*, 138 F.3d at 779.  They merely describe the general topics that Plaintiffs should have

11  explored during the discovery period.

12          Finally, the Court briefly addresses Plaintiffs' assertions that they "did not have a fair

13  opportunity to complete discovery needed to adequately oppose [Defendant's] motion" and that

14  their request for discovery "is supported by good cause."  The discovery deadlines set by the

15  August 14, 2024 scheduling order are those that the parties jointly proposed in the case

16  management statement filed just days before.  At no point did Plaintiffs seek an extension of those

17  discovery deadlines, raise a discovery dispute with the Court, or otherwise seek relief on the

18  grounds now raised in connection with their Rule 56(d) request.  Moreover, the declaration Blue

19  Shield offers in response to Plaintiffs' request shows that Plaintiffs did not diligently pursue

20  discovery.  Blue Shield's counsel attests that Plaintiffs waited until February 25, 2025, days before

21  discovery was set to close on February 28, 2025, to serve written discovery on Blue Shield.

22  Worger Decl. ¶ 8.  The declaration also states that Blue Shield objected to those requests on the

23  grounds that discovery had closed on February 28, 2025 and that the discovery requests were

24  therefore untimely under Local Rule 37-3.[22]  *Id.* ¶ 9.  In light of this, the Court cannot credit

25

---

26  [22] Civil Local Rule 37-3 provides, in pertinent part: "Unless otherwise ordered, as used in any
    order of this Court or in these Local Rules, a 'discovery cut-off' is the date by which all responses

27  to written discovery are due and by which all depositions must be concluded. . . .  Discovery
    requests that call for responses or depositions after the applicable discovery cut-off are not

28  enforceable, except by order of the Court for good cause shown."  N.D. Cal. Civ. L.R. 37-3.

United States District Court
Northern District of California

1    Plaintiffs' assertions that they lacked a fair opportunity to complete discovery or that good cause

2    supports their request for additional discovery under Rule 56(d).

3         Accordingly, Plaintiffs' request for additional discovery is **DENIED**, and the Court now

4    turns to whether summary judgment is appropriate on Plaintiffs' claims for breach of contract and

5    breach of the covenant of good faith and fair dealing.

6              **2.        Breach of Contract**

7         "The elements for a breach of contract action under California law are: (1) the existence of

8    a contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and

9    (4) damages to plaintiff as a result of the breach." *Buschman v. Anesthesia Bus. Consultants LLC*,

10   42 F. Supp. 3d 1244, 1250 (N.D. Cal. 2014) (citation omitted).  At the hearing, the parties

11   indicated that the only disputed element of this cause of action is breach, and so, the Court focuses

12   on that element.

13        "When interpreting contracts, the language used controls if it is clear and explicit."  *Maples*

14   *v. SolarWinds, Inc.*, 50 F. Supp. 3d 1221, 1228 (N.D. Cal. 2014) (internal quotations and citation

15   omitted).  The terms used in a contract are also to be "read in their ordinary and popular sense,

16   unless it appears the parties used the terms in some special sense."  *Id.* at 1228 (internal quotations

17   and citations omitted).  "[T]he meaning of a contract must be derived from reading the whole of

18   the contract, with individual provisions interpreted together, in order to give effect to all

19   provisions and to avoid rendering some meaningless."  *Id.*

20        The principal dispute relevant to Plaintiffs' breach of contract claim is about whether

21   Plaintiffs obtained prior authorization.  Blue Shield argues they did not.  MSJ at 14, 15.  Plaintiffs

22   argue they were prevented from obtaining it, and even if they had not obtained it, they would still

23   be entitled to coverage.  Opp. at 8.  They contend that under the IFP, "failure to obtain prior

24   authorization will not result in a forfeiture of benefits if a mental health admission is both a

25   covered benefit and is medically necessary."  Opp. at 8.  Blue Shield counters that adopting

26   Plaintiffs' interpretation of the IFP "would render the IFP's repeated references to 'limited

27   coverage' for out-of-area services meaningless."  Reply at 10.  Not so.  Coverage is "limited" by

28   the IFP's express terms if the medical care provided does not meet the definition of "Emergency

United States District Court
Northern District of California

United States District Court
Northern District of California

Services, Urgent Services, and Out-of-Area Follow-up Care"[23] or is not "prior authorized by Blue Shield." *See* MSJ at 13 (arguing that "the IFP contemplated that services rendered outside California other than 'Out-of-Area Covered Health Care Services' may be covered—but only where 'prior authorized by Blue Shield' in a particular instance."). Thus, the Court focuses on the provision in the IFP addressing prior authorization. That language reads, in part:

> Prior authorization is required for all non-emergency mental health, behavioral health, or substance use disorder Hospital admissions including acute inpatient care and Residential Care. The provider should call Blue Shield's Mental Health Service Administrator (MHSA) at 1-877-263-9952 at least five business days prior to the admission. Other Outpatient Mental Health Services and Behavioral Health Treatment, and Outpatient Substance Use Disorder Services, including but not limited to, Behavioral Health Treatment (BHT), Partial Hospitalization Program (PHP), Intensive Outpatient Program (IOP), electroconvulsive therapy, Office-Based Opioid Detoxification and/or Maintenance Therapy, Psychological Testing and Transcranial Magnetic Stimulation (TMS) must also be prior authorized by the MHSA.

> If prior authorization was not obtained for an inpatient mental health, behavioral health, or substance use disorder Hospital admission or for any Other Outpatient Mental Services and Behavioral Health Treatment, or Outpatient Substance Use Disorder Service, and the services provided to the Member are determined not to be a Benefit of the plan, or were not Medically Necessary, coverage will be denied.

BSC008565. Based on this language, the failure to obtain prior authorization by itself does not warrant denial of coverage. That outcome only results where "the services provided to the Member are not determined to be a Benefit of the plan, or were not Medically Necessary." *See id.*

With respect to whether inpatient mental health treatment is a Benefit of the plan, the IFP states:

> Benefits are provided for inpatient Hospital and professional services in connection with acute hospitalization for Behavioral Health Treatment, the treatment of Mental Health Conditions, or Substance Use Disorder Conditions.

> Benefits are provided for inpatient and professional services in connection with a Residential Care admission for Behavioral Health Treatment, the treatment of Mental Health Conditions, or Substance

---

[23] Plaintiffs have put forth no evidence that A.Z.'s care would meet the definition of Emergency Services, Urgent Services, and Out-of-Area Follow-up Care. *See* Dkt. No. 64 at 2-3. Accordingly, the Court focuses only on the prior authorization issue.

Use Disorder Conditions.

*See Hospital Benefits (Facility Services), Inpatient Services for Treatment of Illness or Injury* for information on Medically Necessary inpatient substance use disorder detoxification.

BSC008577 (italics in original).

While these benefits, when sought out of the IFP's coverage area, are certainly "limited," *see* BSC0008561, a reasonable insured would read that limitation to mean that they must seek (and obtain) prior authorization from Blue Shield and establish that the services sought are medically necessary.[24]  Whether Plaintiffs have satisfied these limitations such that the services A.Z. received at Elevations and New Haven fall within the scope of coverage are issues the Court cannot resolve as a matter of law.  The current record establishes that when A.Z.'s health care providers contacted Blue Shield to initiate the prior authorization process, Blue Shield simply asserted that services were not a covered benefit, without proceeding to determine whether those services were medically necessary or initiating the preauthorization process.  Based on this, Blue Shield is not entitled to summary judgment on Plaintiffs' breach of contract claim, as a reasonable jury could conclude that the services for which Blue Shield denied coverage should have been prior authorized or should have been covered as medically necessary notwithstanding any failure to obtain prior authorization.[25]  *See Shaw v. McFarland Clinic, P.C.*, 363 F.3d 744, 751 (8th Cir. 2004) (holding that "an employee's action alleging the improper denial of preauthorization for health benefits by her employer is most analogous under Iowa law to an action for breach of a

---

[24] Blue Shield contends that it "is required to provide 'out-of-area coverage' only 'for urgently needed services . . . for which treatment cannot be delayed until the enrollee returns to the plan's service area." Reply at 6 (citing Cal. Health & Safety Code § 1345(h); 22 Cal. Code Regs. § 1300.67(g)).  Still, a reasonable reading of the IFP is that additional services may be covered if prior authorized.

[25] In the briefing, Blue Shield indicates that "Plaintiffs also argued on appeal that Blue Shield's actions violated federal parity regulations, including the Mental Health Parity and Addiction Equity Act of 2008 ('MHPAEA')." MSJ at 27-28.  At oral argument, Plaintiffs confirmed that they assert no cause of action under that statute.  Accordingly, the Court does not reach the parties' arguments on this point.  The Court also does not reach the parties' arguments with respect to California's notice-prejudice rule, *see* Opp. at 25; Def.'s Reply at 13; Pl.'s Reply at 12, given the limited briefing the parties' presented on that issue.  The parties may renew any relevant arguments on this issue in their pre-trial motions if appropriate.

United States District Court
Northern District of California

written contract").[26]

Indeed, the fact that A.Z. was discharged from Elevations on October 30, 2019, against the recommendations of A.Z.'s care team, combined with the fact that Blue Shield covered all inpatient mental health treatment A.Z. previously received at Evolve in January 2019 and later received at New Haven from January 1, 2020 through December 31, 2020, when viewed in the light most favorable to Plaintiffs, suggests that the services A.Z. received at Elevations from May 23, 2019 through October 30, 2019, and at New Haven from October 31, 2019 through December 31, 2019, should have been authorized as medically necessary, an inquiry which Blue Shield never reached. *See Muniz*, 623 F.3d at 1296 (explaining that benefits previously awarded and paid "may be evidence relevant to the issue of whether the claimant was disabled and entitled to benefits at a later date" though insufficient to shift the burden of proof on a benefits claim); *see also Franzese v. United Health Care/Oxford*, 232 F. Supp. 3d 267, 279 (E.D.N.Y. 2017) (determining that, where "there [wa]s no indication that [the insurer] actually considered whether Plaintiffs were entitled to coverage for home health care services, the administrative record d[id] not contain substantial evidence to support Defendant's denial of any such benefits").[27]  However, to the extent Plaintiffs contend they are entitled to summary judgment because the inquiry Blue Shield never conducted must be resolved in their favor as a matter of law, the Court disagrees.  A jury could just as easily conclude that the services A.Z. received in May through December 2019 were not medically necessary.

Accordingly, the parties' cross-motions for summary judgment on the breach of contract

---

[26] Blue Shield attempts to distinguish *Shaw* because the case ultimately turned on a statute of limitations issue, and the underlying dispute concerned a denial of preauthorization for plastic surgery as not covered under the relevant plan.  *See* Reply at 11 n.5.  The Court nonetheless finds the decision persuasive on the issue of whether improper denial of preauthorization can support a breach of contract claim.

[27] Blue Shield's efforts to distinguish *Franzese* fail.  It describes the case as an "ERISA matter involving de novo review of a benefits denial."  Reply at 11 n.5.  But there, like here, the issue was whether the insurer fully considered whether the insured was entitled to certain benefits.  The *Franzese* court found that the insurer had not done so and that as a result, its denial was arbitrary and capricious.  232 F.3d at 279-281.  A jury could reach such a comparable finding here, that is, that Blue Shield did not fully consider whether A.Z.'s treatment was medically necessary or should have been prior authorized, and that it did so in bad faith.

United States District Court
Northern District of California

1    claim are **DENIED**.

2              **3.     Breach of the Covenant of Good Faith and Fair Dealing**

3              To establish a breach of the implied covenant of good faith and fair dealing under

4    California law, Plaintiffs must show that "(1) benefits due under the policy were withheld; and

5    (2) the reason for withholding benefits was unreasonable or without proper cause." *Hergenroeder*

6    *v. Travelers Prop. Cas. Ins. Co.*, 249 F.R.D. 595, 615 (E.D. Cal. 2008). "The gravamen of

7    tortuous behavior in a so-called 'bad faith' suit is the *unreasonable* withholding of benefits due

8    under the policy by the carrier 'measured against its duty arising under the implied covenant of

9    good faith and fair dealing present in every insurance contract.' " *Id.* (citing *Blake v. Aetna Life*

10   *Ins. Co.*, 99 Cal. App. 3d 901, 918 (1979)). "In every insurance policy there is implied by law a

11   covenant of good faith and fair dealing. This implied obligation requires an insurer to deal in

12   good faith and fairly with its insured in handling an insured's claim against it." *Id.* (citing

13   *Gruenberg v. Aetna Ins. Co.*, 9 Cal.3d 566, 574 (1973)).

14             With respect to the first element of breach – whether benefits due under the policy were

15   withheld – the same factual disputes that preclude summary judgment in either party's favor on

16   the breach of contract claim dictate the same outcome with respect to this one. As for the second

17   element – whether the reason for withholding benefits was unreasonable or without proper cause –

18   that "can only be measured by the particular facts of each case." *Allen v. Allstate Ins. Co.*, 656

19   F.2d 487, 489 (9th Cir. 1981) ("What is 'good faith' or 'bad faith' on an insurer's part has not yet

20   proved susceptible to pat legal definition. An insurer's 'good faith' is essentially a matter of

21   fact."). While there is no dispute that Blue Shield failed to assess whether A.Z.'s treatment during

22   from May through December 2019 was medically necessary, the reasonableness of that decision is

23   best suited to a determination by a jury after being apprised of all relevant facts.[28] Summary

24   judgment on this claim is therefore **DENIED**.

25

26   _____

27   [28] Insofar as Blue Shield argues that a genuine dispute over coverage precludes liability on this
     claim, the jury is best positioned to decide whether the facts, as they find them, establish the
28   existence of such a dispute.

United States District Court
Northern District of California

**B.      ERISA**

Turning now to Plaintiffs' ERISA claim for recovery of benefits under the Montefiore Plan, on de novo review of the administrative record, the Court finds that Plaintiffs are entitled to judgment.  The plan covers in-state and out-of-state mental health treatment if it is "Medically Necessary."  The relevant provision reads:

> Benefits are provided only for services that are Medically Necessary.
>
> 1) Services that are Medically Necessary include only those which have been established as safe and effective, are furnished under generally accepted professional standards to treat illness, injury or medical condition, and which, as determined by Blue Shield, are:
>
> a) consistent with Blue Shield medical policy;
>
> b) consistent with the symptoms or diagnosis;
>
> c) not furnished primarily for the convenience of the patient, the attending Physician or other provider;
>
> d) furnished at the most appropriate level which can be provided safely and effectively to the patient; and
>
> e) <u>not more costly than an alternative service or sequence of services at least as likely to produce equivalent therapeutic or diagnostic results as to the diagnosis or treatment of the Member's illness, injury, or disease</u>

BSC008280 (emphasis in original).

As applied here, Plaintiffs have established, by a preponderance of the evidence, that the care A.Z. received while at New Haven from January 1, 2021 to April 28, 2021 was Medically Necessary under the above factors.[29]  The record reflects that the treatment A.Z. received during that time was established as safe and effective, furnished under generally accepted professional

---

[29] At oral argument, Blue Shield indicated that its medical policy is to apply the CALOCUS guidelines.  However, the version of the CALOCUS guidelines that Blue Shield included in the record is not complete.  Of the two items missing, the "anchor points" for each dimension on which a patient should be scored are crucial.  Because Blue Shield has not included these anchor points in the administrative record, this Court cannot determine whether subsection (a) supports either party in this case.  Accordingly, the Court treats it as neutral for the purposes of resolving the parties' cross-motions.  Moreover, because Blue Shield confirmed at oral argument that cost was not a factor in its coverage decision, the Court does not analyze subsection (e).

United States District Court
Northern District of California

United States District Court
Northern District of California

1    standards, and consistent with A.Z.'s symptoms and diagnoses.  At the time A.Z.'s parents moved

2    them from Elevations to New Haven, against the recommendations of Elevations staff, A.Z. had

3    been diagnosed with major depressive disorder, recurrent episode, with psychotic features,

4    unspecified anxiety disorder (OCD, social generalized, possible PTSD traits), social (pragmatic)

5    communication disorder, parent-child relational problem, sibling relational problem, and peer

6    relational problem.  BSC008426.  While at New Haven, notes from A.Z.'s providers show that

7    they participated in individual therapy, family therapy, and group sessions with their peers and

8    took prescribed medications to manage their symptoms.  *See, e.g.*, BSC004015, BSC004198,

9    BSC004220, BSC004260, BSC012470.  A.Z.'s care was administered by qualified mental health

10    professionals, including a psychiatrist, a licensed therapist, and trained clinical staff, and that care

11    team created a comprehensive treatment plan that included different goals, with estimated dates of

12    completion, and a discharge plan.  BSC000447 (discharge summary signed by psychiatrist and

13    registered nurse), BSC000452 (nursing note signed by nursing manager), BSC004026 (residential

14    progress note signed by health care assistant), BSC004032 (residential progress note signed by

15    night watch staff), BSC004193 (individual therapy note signed by licensed clinical mental health

16    counselor), BSC009664-BSC009665 (treatment team notes), BSC012470 (session notes signed by

17    psychiatrist).

18          Plaintiffs have also established, by a preponderance of the evidence, that the care A.Z.

19    received while at New Haven from January 1, 2021 to April 28, 2021 was "not furnished primarily

20    for the convenience of the patient, the attending Physician or other provider" and was "furnished

21    at the most appropriate level which can be provided safely and effectively to the patient."  As

22    documented throughout the record, any lower level of care would not have safely managed A.Z.'s

23    symptoms.  *See* BSC004260 (January 6, 2021 progress note indicating that "[l]ower levels of care

24    failed to alleviate the symptoms"); *see also* BSC004015 (January 29, 2021 therapist notes

25    indicating same); BSC008083 (March 11, 2021 therapy note indicating same).

26          In addition, A.Z.'s treatment team documented the need for continued residential

27    treatment.  On December 31, 2020, A.Z.'s psychiatrist noted that A.Z.'s anxiety,

28    "[d]epressed/irritable mood," and [o]bsessions related to troubling aggressive thoughts, urges, or

images" demonstrated the continued need for residential treatment. BSC012470. Notes from an individual therapy session that took place about a week later reiterated that assessment, stating:

> Writer observes/[A.Z.] continues to report on the following symptoms and behaviors demonstrating the continued need for RTC level of care; Functional Impairments: Impaired social relationships, and Inability to live without support, . Personality Symptoms: Needing reassurance to make decisions, and Shallow expression of emotions, . Limitations in home support. Lower levels of care failed to alleviate the symptoms, and Unavailable/inappropriate support systems, Mood symptoms included: Anxiety, , Apprehension, , Compulsions about arranging object, , Excessive guilt, and Loss appetite, . Physical Symptoms: Excessive energy/fidgeting, , Hyper-vigilance/paranoia, and Inappropriate behaviors to prevent weight gain (purging, laxatives, medications, fasting, excessive exercise)[.]

BSC004260 (punctuation and formatting in original).

Notes from individual therapy sessions held on January 29, 2021 and March 11, 2021 further reinforced the need for continued residential treatment at the time:

> Writer observes/[A.Z.] continues to report on the following symptoms and behaviors demonstrating the continued need for RTC level of care; Functional Impairments: Impaired social relationships, and Inability to live without support, . Personality Symptoms: Needing reassurance to make decisions, and Shallow expression of emotions, . Limitations in home support. Lower levels of care failed to alleviate the symptoms, and Unavailable/inappropriate support systems, Mood symptoms included:Anxiety, , Apprehension, , Compulsions about arranging object, , Excessive guilt, and Loss appetite, . Physical Symptoms: Excessive energy/fidgeting, , Hyper-vigilance/paranoia, and Inappropriate behaviors to prevent weight gain (purging, laxatives, medications, fasting, excessive exercise), .

BSC004015 (punctuation and formatting as set forth in original); *see also* BSC000875 (March 11, 2021 note). So too do psychiatry notes from sessions held on February 4, 2021, March 11, 2021, and April 15, 2021, which indicate A.Z.'s mood symptoms, including anxiety, depression/irritable mood, and obsessions related to troubling aggressive thoughts, urges, or images, demonstrated the continued need for "RTC level of care." BSC013216 (February 4, 2021 psychiatric note); *see also* BSC000876 (March 11, 2011 psychiatric note); BSC009824 (April 15, 2021 psychiatric note).

Notes from around the time A.Z. was discharged from New Haven read, under the "Therapy" heading, "04/26 [A.Z.] is discharging this week and is headed to a new program." BSC009664. The "Residential" section reads, in part:

1

> 4/12: The std had a rough week.  The std really struggled during the
> beginning of the week with self harm.  The std was observed to be
> needing support.  The std was placed on team for a shift during this
> week.  The std made a plan of action to try to have a better week and
> be a good influence on the community before the std leaves.  The std
> has put a lot of effort into caring about the student OJ.  The std also
> is very nervous about leaving.  This has triggered panic attacks
> throughout the week.

BSC009665.

In light of the foregoing, A.Z.'s treatment at New Haven from January 1, 2021 through April 28, 2021 was Medically Necessary within the meaning of the Montefiore Plan. Accordingly, Plaintiffs are entitled to judgment on this claim.  Blue Shield's motion for judgment on the ERISA claim is therefore **DENIED** and Plaintiffs' cross-motion for judgment on the claim is **GRANTED**.  Blue Shield's alternative motion for partial summary adjudication with respect to attorney fees and prejudgment interest on the basis that there was no wrongful denial of benefits under ERISA is also **DENIED**.  The Court directs the parties' lead trial counsel to meet and confer on the appropriate amount of benefits due, attorney's fees, and prejudgment interest.  By no later than January 12, 2026, the parties shall file a further case management statement with an estimate for trial and their availability for trial in February 2026, April 2026, or June 2026.  The parties' statement shall also indicate whether the parties believe further ADR would be fruitful at this point, and if so, their preferred ADR method and expected timeline for scheduling and completing same.

**IT IS SO ORDERED.**

Dated: December 26, 2025

**ARACELI MARTÍNEZ-OLGUÍN**
**United States District Judge**